[Cite as *In re Adoption of A.L.E.*, 2021-Ohio-972.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| | : | |
| IN THE MATTER OF THE ADOPTION | : | Appellate Case No. 2020-CA-52 |
| OF: A.L.E. and A.L.E. | : | |
| | : | Trial Court Case Nos. 20205012 |
| | : | 20205013 |
| | : | |
| | : | (Appeal from Common |
| | : | Pleas Court – Probate Division) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of March, 2021.

. . . . . . . . . .

ANDREW M. ENGEL, Atty. Reg. No. 0047371, 7925 Paragon Road, Dayton, Ohio 45459
        Attorney for Appellant D.B.

RANDAL HARVEY, Atty. Reg. No. 0030658 & WILLIAM M. HARRELSON, II, Atty. Reg.
No. 0087957, 9 West Water Street, Troy, Ohio 45373
        Attorneys for Appellee C.E.

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} D.B. appeals from an order of the probate court which found that his consent was not required with respect to the petitions for adoption of his two biological children filed by C.E., the children's stepfather. The court found that D.B. had failed to have more than de minimis contact with his children, without justifiable cause, for at least a year preceding the filing of the petitions. We hereby affirm the judgment of the probate court.

{¶ 2} C.E. filed his petitions to adopt the children on March 19, 2020; at that time, the children were 12 and 7 years old. The petitions stated that D.B.'s consent to the adoptions was not required because he had failed, without justifiable cause, to have more than de minimis contact with the children for a period of at least one year immediately preceding the filing of the adoption petition.

{¶ 3} A hearing on whether D.B.'s consent was required was held on August 31, 2020. The children's mother ("Mother") and C.E. testified on C.E.'s behalf, and D.B. and his mother ("Grandmother") testified on D.B.'s behalf.

{¶ 4} Mother testified that she and D.B. were never married; they began dating in 1997 and cohabitated for a period of time from the fall of 2010 until March 2012. Their first child was born in 2007, and Mother learned that she was pregnant with their second child in April 2012, shortly after their relationship ended. Mother and the older child lived with Mother's parents after the couple broke up, and Mother testified that she had moved into her current residence in 2013. According to Mother, D.B. had been to that residence, but the last time he had visited the children there was Christmas 2016; Grandmother and her husband had visited the children at Mother's home on Christmas 2017.

{¶ 5} Mother stated that, after her break-up with D.B., their older child occasionally

spent the night with Grandmother, and D.B. would see the child then. Mother testified that the younger child "never went over and stayed," but when the older child went over, Mother and the younger child would "stay for a little bit" so Grandmother could interact with the younger child too.

{¶ 6} Mother testified that, in 2014 or 2015, Grandmother went to Arizona for several months to care for her mother. During that period, the older child would visit with D.B. only if Mother reached out to him, and even then, "sometimes he would answer, sometimes he wouldn't," and if he did answer, sometimes he had an "excuse as to why she couldn't come over; sometimes she could come over." Mother testified that, when Grandmother returned from Arizona, Mother continued to initiate visitation for the older child, but there was not a regular schedule in place; eventually, the frequency of those visits decreased, in part because Grandmother took a job working at a bar on Friday and Saturday nights, which was when the older child typically would have visited.

{¶ 7} According to Mother, she began to receive child support in 2016 after she contacted the Bureau of Support. There was no formal visitation schedule at that time. In 2016 and 2017, the older child was participating in sports and spending time with friends, and the visits with D.B. became very sporadic, if they happened at all, and they eventually stopped altogether. Mother stated that Grandmother's requests for visitation also decreased due to her job at the bar.

{¶ 8} Mother stated that she met C.E. in August 2017 at church; he moved in with her in January 2018, and they were married in July 2018. She stated that she did not have any contact with D.B. in 2018, but that Grandmother occasionally "message[d]" her around holidays or birthdays. Mother testified that the children did not have contact with

D.B. in 2018 or 2019, that he did not reach out to her for visitation by phone or mail during those years, and that he did not file a motion for visitation in the court. According to Mother, D.B. had had no contact with the children since December 2016.

{¶ 9} On cross-examination, Mother acknowledged that she had blocked D.B. on her phone in "2018-ish," but said that he had never reached out to her before that. She also stated that she had blocked Grandmother around 2018. When asked if C.E. told her that he did not want any member of D.B.'s family to have contact with the children, Mother responded that he had not "until we really were pursuing the adoption," because they were not "coming around" anyway except for an occasional holiday or birthday. Mother acknowledged that, on Facebook, C.E. had advised D.B.'s father never to refer to himself as the children's grandfather and that he (the grandfather) was not welcome near the children, Mother, or their property. Mother acknowledged that C.E. further indicated that "you and your family are dead to us" and not to contact Mother. Mother stated that she disapproved of C.E.'s message, but the children "didn't have a relationship with [D.B.] at all" at that time.

{¶ 10} Mother testified that in May 2019, Grandmother and her husband attended one of the older child's softball games; Mother did not know if Grandmother spoke to the children there or may have given them D.B.'s phone number. Mother denied that C.E. shoved Grandmother after the game. Mother testified that D.B. was current in his child support at the time of the hearing.

{¶ 11} On redirect, Mother stated that the older child had been playing softball since she was four years old, and D.B. had never attended a game, including the 2019 game that Grandmother attended.

{¶ 12} In response to a question by the court, Mother testified that from March 19, 2019, when the petition for adoption was filed, until March 19, 2020, D.B. had had no contact with either of the children in person, on the phone, or via email.   She stated that D.B. put a note in her mailbox in August of 2020.[1]   Mother's exchange with the court continued:

THE COURT:   I think I heard there was no other formal request for visitation, but did you and [D.B.] during the last few years talk about visitation generally with the kids, that something needed to be set up or needed to be changed or did you talk about it or anything like that?

THE WITNESS:   No.

THE COURT:   The last time [D.B.] saw [the younger child] was when?

THE WITNESS:   Same thing, that Christmas of 2016 I would say or they jogged my memory that there may have been a 2018 picnic at [D.B.'s father's home.]

THE COURT:   But before that it was Christmas of '16?

THE WITNESS:   Yeah.

THE COURT:   And then likewise, the last contact between [D.B.] and [the older child], is that the same, Christmas of 2016 and then this picnic in 2018?

THE WITNESS:  Yes.

THE COURT:   Are you aware of any other notes that may have

---

[1] We note that notice of the consent hearing was issued on July 16, 2020.

been passed by [D.B.] or on behalf of [D.B.] during that March 2019 through March 2020 period of time?

THE WITNESS: No, sir.

{¶ 13} C.E. testified that he has three children from a previous marriage and that he and Mother have one child together who was born in October 2018. He stated that he found the August 2020 note from D.B. and brought it inside; he was working from home that day, and no one had knocked on the door. C.E. stated that he had not observed any notes from D.B. or Grandmother prior to that one, and he had never seen D.B. until the hearing in this case.

{¶ 14} On cross-examination, C.E. acknowledged that, at the softball game, he advised Grandmother "to please leave us alone," telling her she was not welcome and was "causing a scene." He stated that he did not observe Grandmother give the children a note at that time. C.E. testified, "I did not push the woman. * * * The force of motion, she stepped into me and I stood in front of her with my hand up asking her to please stop and leave us alone and quit following us to the car and badgering us the whole way."

{¶ 15} Grandmother testified that her son D.B. had resided with her in 2018. She stated that, in 2017, they were "still getting the kids," but in 2018 "things started going bad" and Mother stopped bringing the kids around. Grandmother testified that she texted Mother "a lot for me and [D.B.]" to see the children, but got no responses or got excuses that they had other plans.

{¶ 16} Regarding the softball game, Grandmother testified that D.B. did not go because he wanted Grandmother and her husband to "test out the waters to see how it was going to go" because of some of the text messages they had received from C.E.

According to Grandmother, D.B. "was concerned that [C.E.] was either going to be mean to the kids or hurt the kids," and D.B. decided, "let's go another route, so we started writing notes."

{¶ 17} According to Grandmother, she and her husband had been delivering notes on the door of Mother's house "since 2018," and she also told her "niece-in-law" to let Mother know that they were trying "to get ahold of her by leaving notes." Grandmother stated that, "all of a sudden," she found herself blocked on Facebook and the phone, so notes were "the only way to communicate." She stated that D.B. asked her to take notes on his behalf many times, and that he went three or four times with her. She stated that D.B. had asked her to deliver notes between March 2019 and March 2020, and that she had done so four or five times. When asked to describe the "gist" of the notes, Grandmother responded, "I hope the kids are okay, [D.B.] wants to know if he can get them, if they were from him. I wanted to know when I could get the kids. I'm sure they're missing me. I saw pictures. I see that they're growing. I really would like to get them."

{¶ 18} When asked if she expressed her concerns to Mother, Grandmother stated that, after the soft ball game, C.E. "came up behind us talking, talking, talking," so she did not get a chance to talk to Mother, and then Grandmother ended up telling C.E. that he was "being a controlling fool to my grandbabies"; C.E. then pushed Grandmother and told her that "they don't care about us." Grandmother disputed this claim, recounting that the younger child had sat with her "the whole time" at the softball game until Mother and C.E. stopped her from doing so. Grandmother stated that she and D.B. dropped off their most recent note in August 2020. Grandmother denied Mother's claim that she and D.B. had "abandoned the kids," stating that "[t]hey made it harder for us to even get to the kids."

{¶ 19} On cross-examination, Grandmother acknowledged that D.B. had not had any contact with the children between March 2019 and March 2020 "other than giving the notes." When asked if they considered going to court to obtain visitation rights, Grandmother stated that they "didn't have a clue" and were trying to address the issue through the notes.

{¶ 20} D.B. testified that he had tried to communicate with his children in the year before the petition was filed. He stated that, at the time of the 2016 hearing on child support, he "figured it was just solved there, like the terms of visitation." D.B. stated that, until July 2017, he and Mother were "pretty mutual, everything was fine," and the older child was still visiting, then suddenly "everything just really changed." D.B. stated that he had met all of the older child's needs when she was with him and that he had asked Mother many times to allow the younger child to spend the night, but she had refused.

{¶ 21} D.B. stated that, after he and Grandmother were blocked from contacting the children or Mother, the only way he could have made contact was through lawyers, and he "really didn't want that drama for [his] kids." When asked if the text from C.E. to D.B.'s father had led him to decide to "leave the kids alone," D.B. responded that the text made him was to avoid causing "a scene," especially because C.E. had "put his hands on" Grandmother, so D.B. thought it was best that he "didn't go to try to instigate any kind of situation." D.B. thought it was "pretty significant" that Mother blocked his numbers and prevented him from contacting the children. He testified that he and Grandmother "decided to put the notes in the mailbox" by the road so that they did not have to step on Mother and C.E.'s property. When asked what he did specifically to try to communicate with his children in the year prior to the petition, D.B. responded, "[w]e took notes over

there," and he stated that he asked Grandmother to give the older child their phone numbers at the softball game, so the child could contact him directly.

{¶ 22} On cross-examination, D.B. stated that he last saw his children in the summer of 2017 at a cook out at his father's home. He stated that, in 2018, he tried to have Grandmother contact Mother on his behalf many times about visits, because Grandmother's numbers and Facebook were not blocked yet, and there was "no other way." He stated that he "probably took the wrong route by trying to reach out through someone else," but he was "physically blocked and hampered" from direct contact. Regarding 2019, D.B. stated that leaving notes "was about all [they] could do" because he was "worn down from not being able to do anything" and "depressed" by the situation.

{¶ 23} D.B. stated that, after the 2016 hearing on child support, he believed had had "standard terms of visitation" for having the kids every other weekend, but he was unable to produce any court order to that effect. When asked if he tried to locate a copy of the order, he stated that he had tried recently but did "know the route to go for that" and would like to have that arrangement implemented. D.B. cited the fact that he had moved twice since 2016 in explanation for not being able to find the document, noting that it was probably in a box somewhere or in a "municipal record." D.B. stated that he had always been aware of the location of Mother's residence, but had never sent anything there by certified mail or by Fed Ex and had not consulted an attorney until recently because he "didn't have the means to really pay for it."

{¶ 24} When asked by the court who the older child would call in earlier years when she wanted to visit, D.B. responded that she would call him or Grandmother, and he described how he, Mother, or Grandmother would pick up and drop off the children.

When asked by the court if he put the notes he delivered to Mother's house in envelopes, D.B. stated that "[t]hey were just folded pieces of paper," either addressed to Mother or to the children.

{¶ 25} On August 31, 2020, the probate court filed an order concluding that D.B.'s consent to the adoption was unnecessary. In its decision, the court noted that the children had resided with Mother since the spring of 2012 and that, at first, D.B. saw them "on a fairly regular basis" when the children visited Grandmother. The court noted that, in 2016, the couple were in juvenile court for the establishment of child support payments, and D.B. was current on his child support at the time of the hearing. The court found that it was "not clear" from the evidence that a formal order of visitation was ever signed by the couple or by a judge.

{¶ 26} The court noted that D.B.'s visitation with the children "gradually lessened" when Grandmother began working "on a third shift rotation," and when Mother thereafter began a relationship with C.E. The court noted that Mother and C.E.'s relationship with D.B. and Grandmother deteriorated until the time of the hearing, which affected D.B.'s visitation. "Indeed, there was no personal contact between [D.B.] and the children after [Mother] began her relationship with [C.E.]. His last contact appears to have been briefly at a cookout in July of 2017."

{¶ 27} The court found that there was "no debate" that D.B. had failed to have any personal contact with either child between March 19, 2019, and March 19, 2020, when the petitions were filed. Although D.B. and Grandmother testified that they had dropped off six to eight notes for the children and/or Mother at the mailbox of the children's residence during 2019, Mother and C.E. did not acknowledge receiving the notes. The

court stated that it could not conclude that dropping six to eight notes off at a mailbox established sufficient contact with the children "to cross the threshold consideration" for consent to be required. Thus, the probate court concluded that D.B. had failed to have more than de minimis contact with the children during the one year period prior to C.E.'s filing the petitions for adoption.

{¶ 28} Next, the court considered whether there was justifiable cause for D.B.'s failure to have contact with the children. The court referenced D.B.'s testimony about "volatility" between C.E. and his parents, specifically "a rather ugly argument and confrontation" between Grandmother and C.E. at a softball game in May 2019 and a "belligerent" message from C.E. to D.B.'s father. The court also considered that Mother had blocked D.B. and his family from reaching her by phone, Facebook, or other technology.

{¶ 29} In its decision, the court reasoned:

* * * First, the issue before this Court concerns the contact between [D.B.] and his two children. The contact of [D.B.'s parents] with the children, for purposes of this task, is irrelevant. Second, and consistent with this, the relationship between [D.B.'s parents] with [C.E.], as volatile as it may be, is irrelevant to the issue at bar. Finally, the Court notes that, though married to the mother of the children, [C.E.] has no standing with respect to these two children. To that end, while [C.E.'s] conduct with respect to * * * [D.B.'s] family might fairly be characterized as imprudent, the Court's attention remains on the actions of [D.B.]; and on that of the biological mother.

With this in mind, and though the primary concern is on the applicable one-year period of time, nevertheless this Court does observe that it has been over three years since [D.B.] spoke with either child in person or on the telephone. The Court does find that [Mother] did present an obstacle to [D.B.'s] visitation with the children when she blocked his attempt to call her by telephone. While this Court sees the difficulty this presented [D.B.], nevertheless, the Court cannot concur with his assessment that this obstacle was unreasonably insurmountable. [D.B.] concedes, for example, that he never wrote a letter to [Mother] demanding visitation. Nor did he seek the advice of legal counsel to assess his legal options. Nor did he, on a pro se basis, bring the matter of visitation back to the attention of the Court. Surely [D.B.] had not forgotten that a court had assumed jurisdiction over the case when he had appeared, pro se, in the past on the issue of support. And indeed, the Court notes that [D.B.] ultimately did hire legal counsel, but not until August 17, 2020 - - five months after the Petitions for Adoption were filed.

{¶ 30} The court found "no evidence" that Mother had denied any request by D.B. for visitation, and that while D.B. "would like this Court to infer that by blocking his telephone calls [Mother] was acting to deny his visitation rights, it is equally plausible that her actions were as a result of a new relationship with a different man." The court found that "[e]ither way, at some point it becomes incumbent upon a biological father to pursue more significant avenues to secure visitation than simply dropping off pieces of paper at a mailbox," considering that he knew where Mother lived, knew "how to find his way to a

court of law," and knew how to hire an attorney.   The court found that D.B. "simply failed to do anything about visiting his children during not only the one-year prior to the filing of the Petition, but for over three years."

{¶ 31}   D.B. appeals from the probate court's order finding that his consent to the adoption was not needed, raising four assignments of error.   We consider these assignments together:

THE PROBATE COURT ERRED BY FAILING TO CONSIDER ALL THE SURROUNDING FACTS AND CIRCUMSTANCES OF THE CASE.

THE PROBATE COURT ABUSED ITS DISCRETION IN CONCLUDING THAT [D.B.] FAILED TO PROVIDE MORE THAN DE MINIMIS CONTACT WITH HIS CHILDREN IN THE YEAR PRIOR TO THE FILING OF THE PETITION.

THE PROBATE COURT ERRED IN ITS CONCLUSION THAT [D.B.'S] FAILURE TO PROVIDE MORE THAN DE MINIMIS CONTACT WITH HIS CHILDREN WAS WITHOUT JUSTIFIABLE CAUSE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

THE PROBATE COURT ERRED BY APPLYING THE INCORRECT LEGAL STANDARDS TO ITS FINDING OF LACK OF JUSTIFIABLE CAUSE.

{¶ 32} In his first assignment of error, D.B. asserts that the probate court "expressly removed a considerable amount of evidence from consideration" by finding that the evidence of contact between [D.B.'s] parents and the children and of the tension between C.E. and his parents was "irrelevant."   D.B. characterizes C.E.'s conduct as "the sole

reason all contact between [D.B.] and his children ceased" and argues that the court erred in refusing to consider it.

{¶ 33} In his second assignment of error, D.B. asserts that the question before the probate court "was not whether [D.B.] actually contacted his children" but "whether he made that interaction available to his children," and he contends that he and his mother "worked together to make that contact happen." D.B. argues that he repeatedly tried to initiate contact with his children and recruited Grandmother to help him, but he could not "control the actions" of Mother and C.E.

{¶ 34} In his third assignment of error, D.B. asserts that the court erred in failing to consider Mother's prior relationship with D.B.'s family and D.B.'s "faithful payment" of child support. According to D.B., his relationship with Mother deteriorated over time, C.E. "triggered that change," and C.E.'s "precipitated a dissolution" of D.B.'s relationship with his children. D.B. also asserts that C.E.'s conduct caused him to fear for his children's safety.

{¶ 35} Finally, in his fourth assignment of error, D.B. argues that the probate court's examination of Mother's motives for blocking D.B.'s calls was "unwarranted" and erroneous, because her motives were irrelevant and the court's speculation about those motives improperly "shifted the burden of proof" onto D.B. According to D.B., the court's reasoning suggested that "a mother is justified in placing her relationship with a new man above the rights of [her children's] father" and the children's need to interact with their father. He asserts that Mother "significantly interfered" with his ability to reach his children" by "blocking" him. He also contends that the probate court, rather than using the "justifiable cause" standard under R.C. 3107.07, adopted a standard based on

"insurmountable circumstances."

{¶ 36} "Because adoption acts to permanently terminate parental rights, the written consent of a minor child's parents is ordinarily required in order to proceed with the adoption action. *In re Adoption of A.L.S.*, 2018-Ohio-507, 106 N.E.3d 69, ¶ 13 (12th Dist.). However, R.C. 3107.07 provides exceptions to the consent requirement." *In re L.R.O. and C.A.O.*, 2d Dist. Darke Nos. 2019-CA-19, 2019-CA-20, 2020-Ohio-3200, ¶ 7.

{¶ 37} R.C. 3107.07 provides:

Consent to adoption is not required of any of the following:

A parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

{¶ 38} The statute is written in the disjunctive; thus, the failure without justifiable cause to provide either more than de minimis contact or maintenance and support for the one-year time period is sufficient to obviate the need for a parent's consent. *In re L.R.O. and C.A.O.* at ¶ *7,* citing *In re Crandall,* 1st Dist. Hamilton No. C-060770, 2007-Ohio-855, ¶ 10*.*

{¶ 39} This Court further explained:

The party petitioning for adoption has the burden of proving, by clear

and convincing evidence, that either exception applies. *In re R.L.H.*, 2d Dist. Montgomery No. 25734, 2013-Ohio-3462, ¶ 9. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of fac[t] a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

The Supreme Court of Ohio has set forth a two-part analysis for probate courts to employ when applying R.C. 3107.07(A). *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-Ohio-236, 963 N.E.2d 142, ¶ 23. The first step involves the factual determination of whether the parent failed to have contact or to provide support for a period of at least one year immediately preceding the filing of the adoption petition. *Id.* The probate court exercises discretion in making these determinations, and thus, an appellate court applies an abuse of discretion standard[2] when reviewing the probate court's decision. *Id.* at ¶ 21. If the probate court finds the parent failed to provide more than de minimis contact or failed to provide for

---

[2] An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Decisions are unreasonable if no sound reasoning supports the decision. *Id.*

the maintenance and support of the minor, it then must determine whether justifiable cause for the failure has been proved by clear and convincing evidence.  *Id.* at ¶ 23.  Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed on appeal.  *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 281, 376 N.E.2d 578 (1978).

(Footnote added.) *In re L.R.O. and C.A.O.* at ¶ 8-9.

{¶ 40} This Court has concluded "that justifiable cause may be demonstrated by events either before or during the one year prior to the filing of the petition or a combination of both."  *In re C.D.G. and N.A.G.*, 2d Dist. Montgomery Nos. 28664, 29665, 2020-Ohio-2959, ¶ 15.

{¶ 41}  Contrary to D.B.'s assertions, the probate court engaged in the correct two-part analysis at the consent hearing.  It is undisputed that D.B. had no direct contact with either child, not only in the year preceding the March 19, 2020 petitions, but, per D.B.'s testimony, since a brief encounter at a cookout in 2017.  We see no abuse of discretion in the court's factual determination that D.B. failed to have contact in the relevant period.

{¶ 42} Regarding the second part of the analysis, the probate court's conclusion that D.B.'s failure to have contact with the children was without justifiable cause was supported by competent and credible evidence.  We note that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact."  *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.  D.B. testified that "everything changed" in terms of visitation after July 2017, 18 months before the petitions were filed.  The record does not support D.B.'s assertion that C.E.'s conduct

was the "sole" reason all contact between him and the children ceased. D.B. knew at all times where Mother and his children lived. D.B. stated that he viewed being blocked from contact with Mother as "pretty significant," but in response, he did nothing more than leave a few notes at Mother's home. According to Grandmother's testimony, she left notes on D.B.'s behalf, and D.B. only accompanied her three or four times. D.B. acknowledged that he could have obtained legal counsel to pursue visitation, but said that he "didn't want that drama" for his kids. As the probate court noted, it was not until August 17, 2020 that counsel for D.B. entered an appearance, nearly five months after the petitions were filed. Further, D.B. had previously acted in a pro se capacity in child support proceedings; according to the probate court, he "knew how to find his way to a court of law" on his own. We agree with the probate court that "at some point it becomes incumbent upon a biological father to pursue more significant avenues to secure visitation." This is especially true here, where D.B. testified that he believed a valid visitation order had been issued in 2016 and that he feared for the safety of his children.

{¶ 43} The probate court did not abuse its discretion in concluding that D.B. failed to have more than de minimis contact with his children, without justifiable cause, in the year preceding the filing of the petition for adoption, and that accordingly, his consent to the adoptions was not required. D.B.'s assignments of error are overruled.

{¶ 44} The judgment of the probate court is affirmed.

. . . . . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies sent to:

Andrew M. Engel
Randal Harvey
William Harrelson, II
Hon. Richard P. Carey